# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SCION 2040 MANAGING MEMBER LLC,

PLAINTIFF,

V.  CASE NO. 10-C-825

EBREF HODLING COMPANY, LLC AND
ASB ALLEGIANCE REAL ESTATE FUND,

DEFENDANTS.

# DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. PROCEDURAL HISTORY

Currently pending before the court is the motion of plaintiff Scion 2040 Managing Member LLC ("2040") for summary judgment as to its complaint and the defendants' counterclaim. (Docket No. 48.) The defendants, ASB Allegiance Real Estate Fund ("Allegiance") and EBREF Holding Company, LLC ("EBREF"), have responded, (Docket No. 57), and the plaintiff has replied, (Docket No. 66). The pleadings are now closed and the matter is ready for resolution. All parties have previously consented to the full jurisdiction of the magistrate judge. (Docket Nos. 11, 14.)

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). Material facts are those facts which, under the governing substantive law, might affect the outcome

of the suit. Anderson, 477 U.S. at 248. A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

The parties' LLC agreement contains a choice of law provision stating that it is governed by Delaware law. (Docket No. 1 at 56.) Therefore, the parties agree that it is Delaware law that governs the defendants' counterclaim for reformation. See, e.g., Auto-Owners Ins. Co. v. Websolv Computing, Inc., 580 F.3d 543, 547 (7th Cir. 2009).

**III. FACTS**

Although the factual history of this litigation is extensive and complex, the court shall focus here upon only the facts necessary to resolve the present motion. ASB Capital Management, LLC ("ASB") and The Scion Group, LLC ("Scion") joined together to develop student housing near universities across the country. (Docket No. 7 at 3.) Allegiance is managed by ASB, (Docket No. 9-1 at ¶2), and EBREF is wholly owned by ASB, (Docket No. 9-1 at ¶3). For the sake of simplicity,

the defendants may be referred to here collectively as simply "ASB." Allegiance's trustee is Chevy Chase Trust Company, which was formerly known as the Chevy Chase Trust Company Collective Investment Trust Employee Benefit Real Estate Fund. (Docket No. 9-1 at ¶2.)

For each relevant property development, a separate Delaware limited liability company ("LLC") was created with one ASB member, which provided nearly all the capital, and one Scion member, which provided the remaining capital and was tasked with management. (Docket No. 9-1 at ¶8.) In the present case, the Scion member is the plaintiff, Scion 2040 Managing Member, LLC ("2040"), an Illinois LLC, (Docket No. 1 at ¶1). 2040 joined with Chevy Chase Trust Company Collective Investment Trust Employee Benefit Real Estate Fund to form 2040 Lofts, LLC, a Delaware LLC, (Docket No. 1 at 15), to develop housing near the Marquette University campus in Milwaukee, Wisconsin.

After the first two transactions, which are not at issue here, the parties began re-negotiating the "promote" structure of future deals. (See, e.g., Docket No. 57-1 at ¶17.) Representatives of the relevant entities included the following: Keyvan Arjomand for ASB Capital Management; Cara Nelson, an attorney from DLA Piper US LLP who represented ASB; Barbara Trachtenberg a second attorney from DLA Piper US LLP who represented ASB; Robert (Rob) Bronstein, the President of Scion; and Eric Bronstein, in-house counsel for Scion and brother of Rob Bronstein. (Docket No. 57-1 at ¶¶11-12.) The representatives negotiated a new LLC agreement primarily through email. (Docket No. 57-1 at ¶¶11-12.) For clarity, the court shall refer to each Bronstein brother by only his first name.

Using shorthand, the parties negotiated changes in the promote structure. Because "promote" is not a term that is as common as other frequently-litigated transactional terms, it is appropriate to pause here to provide an explanation as to what a promote is and how it might be utilized.

3

A promote is, in essence, an additional incentive for one partner to see that a project succeeds. An example of where this might be utilized is when two partners agree to develop commercial real estate. One partner is primarily an investor and thus puts up 75% of the capital while the other partner is primarily the manager and puts up only 25% of the capital. To provide the managing partner a greater incentive to see that the project is a success, the partners might agree to a promote, which the manager will realize when the investment is sold. Often, a promote will become relevant only if the investment achieves a certain return, for example, 10%. Thus, if the investment is sold and results in a 15% return, rather than simply dividing the whole 15% return between the partners proportional to the amount of capital invested, the first 10% would be divided proportionally in accordance with the amount of capital invested while the remaining 5% will be divided according to the promote structure, which might call for the manager to receive 35%, i.e. 10% more than what it otherwise would have been entitled to in light of its 25% capital investment, as a reward for the investment exceeding a 10% return. In ASB's view, the shorthand for this sort of promote structure would be "35% over a 10%." (Docket No. 57 at 6.) The promote might increase as the return increased so that there might be a multi-tiered promote structure in a contract, e.g. 35% over a 10% and 40% over a 20%. The court shall address additional facts below as necessary.

**IV. ANALYSIS**

In ASB's view, any promote necessarily must come only after each partner has received a return of its invested capital, and thus a promote is relevant only if the investment is profitable. It contends that it was this sort of structure, i.e. return of capital before promote, to which it agreed. However, the written LLC agreement between the parties at issue in this litigation, as well as similar LLC agreements that are at issue in related suits pending in different courts across the country, provides that the Scion member is to be paid its promote before each partner received the return of its capital. Because the appraisal used to calculate ASB's buyout of 2040 was less than the

total capital investment, when combined with the distribution order set forth in the LLC agreement, the end result was, according to ASB, that 2040 received a 282% return on its capital investment while ASB lost over 30%. (Docket No. 57 at 7.) ASB contends that the written LLC agreement mistakenly and contrary to the parties' prior agreement put the promote ahead of the return of capital, and therefore the defendants seek reformation of the written LLC agreement. 2040, on the other hand, seeks enforcement of the contract as written.

Parties, especially experienced and sophisticated parties, are generally held strictly to the terms of an unambiguous contract; thus, failing to read or understand a contact is usually no defense against its terms. However, the equitable remedy of reformation, which "by definition involves a party who has not read, or thought about, the provisions in a contract carefully enough," Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P., 794 A.2d 1141, 1154 (Del. 2002), is a narrow exception to this general principle.

> There are two doctrines that allow reformation. The first is the doctrine of mutual mistake. In such a case, the plaintiff must show that both parties were mistaken as to a material portion of the written agreement. The second is the doctrine of unilateral mistake. The party asserting this doctrine must show that it was mistaken and that the other party knew of the mistake but remained silent. Regardless of which doctrine is used, the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement.

Id. at 1151-52 (footnotes omitted).

> The clear and convincing evidentiary standard is an intermediate evidentiary standard, higher than mere preponderance, but lower than proof beyond a reasonable doubt. The Delaware Court on the Judiciary has described this standard as requiring evidence which produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions are highly probable. Authorities also say that, to meet this burden, the evidence must produce in the mind of the fact-finder a firm belief or conviction that the allegations in question are true. The Superior Court's civil jury instructions on clear and convincing evidence require the proof to be highly probable, reasonably certain, and free from serious doubt.

Id. at 1151 (footnotes and internal quotation marks and brackets omitted).

The defendants present alternative grounds for relief in their counterclaim, alleging that either a mutual or unilateral mistake occurred here. (Docket No. 20 at 7.)

The plaintiff contends that the defendants have failed to muster sufficient evidence that would permit a reasonable finder of fact to conclude that the defendants have sustained their burden to prove by clear and convincing evidence that reformation is appropriate. Because reformation is not only the basis for the defendants' counterclaim, but also the defendants' defense to the plaintiff's complaint, the plaintiff seeks dismissal of the counterclaim and judgment in its favor on its breach of contract claim.

In order to prevail on their counterclaim for reformation, the defendants submit that they must prove the following factual propositions by clear and convincing evidence:

(1). The parties previously agreed that the return of capital should come before the promote;

(2). The defendants were unaware that the written LLC agreement did not accurately recount this prior agreement; and

(3). The plaintiff also did not know that the written LLC agreement did not recount the parties' prior agreement or that the plaintiff recognized the mistake but stayed silent. (See Docket No. 57 at 3 (citing Cerberus, 794 A.2d at 1153-54).)

The plaintiff in reply contends that the defendants have totally failed to present clear and convincing evidence that the parties reached an agreement that was incorrectly reduced to writing. The plaintiff affirmatively submits that it was not mistaken about the contents of the written LLC agreement nor did it knowingly keep silent about a document that did not accurately reflect the parties' agreement.

**A. Prior Agreement**

With respect to evidence of a prior agreement, the defendants point primarily to a May 9, 2007 email that Arjomand sent to the Bronstein brothers wherein he proposed, "[o]n an unlevered

deal, 20% over an 8%, and 35% over a 12%. On a levered deal, 20% over a 9%, and 35% over a 15%." (Docket No. 69 at ¶26.) Rob replied, "Yes, I agree with all this. Thanks." (Docket No. 69 at ¶30.) The defendants contend that based upon common shorthand utilized in the industry and the parties' prior dealings, this was an agreement for the return of capital before any promote. The plaintiff, on the other hand, contends that there is no such common shorthand in the industry and this email exchange could not be reasonably interpreted as an agreement that capital would be returned before any promote.

The court concludes that a rational finder of fact could find by clear and convincing evidence that the parties had a prior agreement that capital would be returned to each investor prior to any promote. Assessing Arjomand's, or any other person's, understanding of the email involves determinations of credibility that are beyond the scope of summary judgment. Thus, the court rejects the plaintiff's argument that summary judgment in its favor is appropriate on the basis that the defendants have failed to muster sufficient evidence as to the first element of reformation.

**B. Defendant's Mistake**

As for the second proposition, i.e. that the defendants were unaware that the written LLC agreement did not accurately recount this prior agreement, it is clear to the court that the defendants have mustered sufficient evidence to defeat summary judgment on this basis. Therefore, the court finds it unnecessary to further discuss this proposition.

**C. Plaintiff's Mistake or Plaintiff's Knowing Silence**

Rather, much of the dispute focuses upon the third proposition necessary for reformation. The plaintiff contends that it did not mistakenly believe that capital would be returned prior to the promote and points to June 14, 2007 email from Eric to Nelson wherein he notes an error in a draft LLC agreement for the Breckenridge property regarding the promote structure. (See Docket No. 50-15 at 2-3.)

An early draft of the Breckenridge LLC agreement drafted by Nelson and sent to the Bronsteins stated as follows with respect to the distribution of proceeds upon sale or refinancing:

> **Section 4.2. <u>Distribution of Proceeds upon Sale or Refinancing</u>**
>
> Subject to the terms of <u>Section 3.4.2</u> hereof, in the event of a Sale or Refinancing, the Proceeds thereof shall be distributed to the Members in the amounts and, as and when determined by the Fund in its sole and absolute discretion, in the following order of priority:
>
> (i) *First*, among the Members in proportion to the Unrecovered Voluntary Additional Capital Contributions of each of the Members at such time, until such time as each Member's Unrecovered Voluntary Additional Capital Contributions has been reduced to zero;
>
> (ii) *Second*, among the Members in proportion to the Unrecovered 9~~9~~<u>8</u>% Preferred Return Amounts of the Members at such time, until such time as each Member's Unrecovered 9~~9~~<u>8</u>% Preferred Return Amount has been reduced to zero;
>
> <u>(iii)</u> *Third*, **among the members in proportion to the Unrecovered 15% Preferred Return Amount of the Members at such time, until such time as each Member's Unrecovered 15% Preferred Return Amount has been reduced to zero;**
>
> **<u>(iv)</u> Fourth,** among the Members in proportion to the Invested Capital of the Members at such time, until such time as each Member's Invested Capital has been reduced to zero;
>
> **<u>(v)</u>** ~~(iv)~~ ~~*Fourth*~~*<u>Fifth</u>*, (x) the Remaining Percentage to the Members in proportion to their respective Percentage Interests at such time, and (y) the Promote Percentage to Venture Partner.

(Docket No. 50-13 at 22 (alterations and emphasis in original).)

In relevant part, Eric replied:

I may not have read it correctly, but I think the distribution paragraphs (both operational proceeds and liquidation proceeds) seem to be missing language applying the "Promote Percentage" split after the first-tier preferred return has been achieved but before the second-tier has been reached. As I read it now, it looks like it measure the first-tier preferred return (plus any unrecovered preferred return) and then goes straight to the second-tier preferred return before invoking the "promote" split.

(Docket No. 50-15 at 3.) In response, Nelson made changes resulting in the following black-line draft:

### Section 4.2. Distribution of Proceeds upon Sale or Refinancing

Subject to the terms of Section 3.4.2 hereof, in the event of a Sale or Refinancing, the Proceeds thereof shall be distributed to the Members in the amounts and, as and when determined by the Fund in its sole and absolute discretion, in the following order of priority:

(i) *First*, among the Members in proportion to the Unrecovered Voluntary Additional Capital Contributions of each of the Members at such time, until such time as each Member's Unrecovered Voluntary Additional Capital Contributions has been reduced to zero;

(ii) *Second*, among the Members in proportion to the Unrecovered 9̶8% Preferred Return Amounts of the Members at such time, until such time as each Member's Unrecovered 9̶8% Preferred Return Amount has been reduced to zero;

(iii) *Third*, a̶m̶o̶n̶g(x) the m̶e̶m̶b̶e̶r̶s̶ ̶i̶n̶ ̶p̶r̶o̶p̶o̶r̶t̶i̶o̶n̶ ̶t̶o̶ ̶t̶h̶e̶ ̶U̶n̶r̶e̶c̶o̶v̶e̶r̶e̶d̶ ̶1̶5̶%̶ ̶P̶r̶e̶f̶e̶r̶r̶e̶d̶ ̶R̶e̶t̶u̶r̶n̶ ̶A̶m̶o̶u̶n̶t̶s̶ ̶o̶f̶ ̶t̶h̶e̶ ̶M̶e̶m̶b̶e̶r̶s̶ ̶a̶t̶ ̶s̶u̶c̶h̶ ̶t̶i̶m̶e̶,**Remaining Percentage to the Members in proportion to each Member's respective Percentage Interest at such time, and (y) the Promote Percentage to Venture Partner** until such time as each Member's Unrecovered 1̶5**12**% Preferred Return Amount has been reduced to zero; **and**

(iv) *Fourth*, among the Members in proportion to the Invested Capital of the Members at such time, until such time as each Member's Invested Capital has been reduced to zero;

(v) *Fifth*, (x) the Remaining Percentage to the Members in proportion to their respective Percentage Interests at such time, and (y) the Promote Percentage to Venture Partner.

(Docket No. 50-15 at 25 (alterations and emphasis in original).)

The Breckenridge LLC agreement served as the basis for the 2040 LLC agreement at issue here, which states in relevant part:

### Section 4.2. Distribution of Proceeds upon Sale or Refinancing

Subject to the terms of Section 3.4.2 hereof, in the event of a Sale or Refinancing, the Proceeds thereof shall be distributed to the Members in the amounts and, as and when determined by the Fund in its sole and absolute discretion, in the following order of priority:

(i) *First*, among the Members in proportion to the Unrecovered Voluntary Additional Capital Contributions of each of the Members at such time, until such time as each Member's Unrecovered Voluntary Additional Capital Contributions has been reduced to zero;

(ii) *Second*, among the Members in proportion to the Unrecovered 8% Preferred Return Amounts of the Members at such time, until such time as each Member's Unrecovered 8% Preferred Return Amount has been 'reduced to zero;

(iii) *Third*. (x) the Remaining Percentage to the Members in proportion to each Member's respective Percentage Interest at such time, and (y) the Promote Percentage to Venture Partner until such time as the Fund's Unrecovered 12% Preferred Return Amount has been reduced to zero; and

(iv) *Fourth*, among the Members in proportion to the Invested Capital of the Members at such time, until such time as each Member's Invested Capital has been reduced to zero;

(v) *Fifth*, (x) the Remaining Percentage to the Members in proportion to their respective Percentage Interests at such time, and (y) the Promote Percentage to Venture Partner.

(Docket No. 1 at 31 (emphasis in original).) Significant in the present dispute is the term "Promote Percentage," which is defined in the agreement as follows:

> (a) for purposes of calculating distributions under Sections 4.1(iv) and 4.2(iii), twenty percent (20%) and (b) for purposes of calculating, distributions under Sections 4.l(v) and 4.2(v), thirty-five percent (35%); provided that if Venture Partner's designation as Managing Member has been removed and the Venture Partner's interest has been reduced solely to its Economic Interest pursuant to Section 5.1.4 hereof, the Promote Percentage shall be equal to zero percent (0%).

(Docket No. 1 at 23.)

Thus, based upon the court's reading of these relevant provisions, the first tier of the promote, i.e. the 20% in section 4.2(iii), comes before the return of the capital in section 4.2(iv), while the second tier promote, i.e. the 35% in section 4.2(v), which had been the only promote in prior deals where there was only a single tiered promote, comes after the return of capital.

It was Nelson's incorporation of Eric's suggestions that the parties refer to as the point where the LLC agreement came to be written so that the promote came before the return of capital.

The defendants contend that in his email, Eric was merely noting that one tier of the promote structure had been omitted and not expressing a view that the parties had agreed that the promote should come before the return of capital. (Docket No. 69, ¶50.) The plaintiff disputes this contention, but it recognizes that Eric did not expressly refer to the return of capital. (Docket No. 69, ¶50.) The plaintiff also acknowledges that placing the return of capital before the promote would have been consistent with Eric's email, but it contends that placing the promote ahead of the return of the capital, as Nelson did, was likewise consistent with Eric's email. (Docket No. 69, ¶51.)

There is plainly a significant disagreement as to the intended impact of Eric's email concerning the distribution paragraphs. If the finder of fact was to accept that Eric intended the promote to come before the return of capital, this would preclude a finding of mutual mistake. It would also seem to foreclose a finding of unilateral mistake, because if Eric understood that having the promote come before the return of the capital embodied the parties' agreement, the defendants could not show that the plaintiff was knowingly silent in the face of recognizing a mistake in the drafting of the LLC agreement. However, a determination of what Eric understood requires consideration of disputed material facts including Eric's credibility, and thus summary judgment in favor of the plaintiff is inappropriate.

The court also concludes that there are disputes of material fact that preclude the court from granting the plaintiff's motion for summary judgment on the basis of ratification or unclean hands.

## V. CONCLUSION

As discussed by the court in <u>Cerberus</u>, at the summary judgment stage, while the trial court can consider the substantive evidentiary standard, the test is not whether the party bearing the burden of proof will prevail at trial, only whether genuine issues of material fact in regard to that burden have been established. See <u>Cerberus</u>, 794 A.2d at 1148-49. Despite the plaintiff's strong

11

belief that the defendants lack the sufficient quantum of evidence to prevail on their counterclaim, that is not the test.

Based upon the submissions, the court believes a rational finder of fact could conclude by clear and convincing evidence that the May 9, 2007 email exchange between the parties constituted an agreement that each investor's capital would be returned before the promote, but because of an error when Nelson drafted the document, of which the defendants were unaware and the plaintiff was either unaware or knew to be mistaken yet remained silent, the final written LLC agreement mistakenly put the promote ahead of the return of capital. Therefore, the plaintiff's motion for summary judgment must be denied.

**IT IS THEREFORE ORDERED** that the plaintiff's motion for summary judgment, (Docket No. 48), is **denied**. The court's October 3, 2011 scheduling order, (Docket No. 46), remains in place.

Dated at Milwaukee, Wisconsin this 20th day of December 2011.

AARON E. GOODSTEIN
U.S. Magistrate Judge